Dale B. BEACH, Respondent,

v.

DIRECTOR OF REVENUE, Appellant.

No. WD 65314.

Missouri Court of Appeals,
Western District.

April 18, 2006.

Jeremiah W. (Jay) Nixon, Atty. Gen., Kristen Paulsmeyer, Office of Atty. Gen., Jefferson City, for Appellant.

Fred R. Bunch, Clinton, for Respondent.

Before JOSEPH M. ELLIS, P.J., HAROLD L. LOWENSTEIN, J., and PAUL M. SPINDEN, J.

PAUL M. SPINDEN, Judge.

After Dale B. Beach initially agreed to submit to an officer's test of his breath for alcohol content, he declared that he would take the test only if the officer flushed mace from his eyes and only when he could see the breath-analyzing machine. The officer deemed this to be a refusal to submit to the test and reported it as such to the director of the Department of Revenue who revoked Beach's driving license for a year under Section 577.041, RSMo Supp.2005.[1]  Beach sought the circuit court's judicial review, and the circuit court set aside the revocation because of what it deemed to be "a conflict in evidence."  The director appeals to this court. We reverse the circuit court's judgment.

The incident leading to Beach's arrest began when Warsaw police officer, Brian York, saw the car driven by Beach make an extremely wide turn on a Warsaw street at 11:37 P.M. on October 29, 2004. Beach's car crossed completely into the oncoming lane.  York stopped Beach's vehicle.  York asked Beach for his driving license and proof of automobile liability insurance, and Beach replied that he did not have his driving license with him. York noted that Beach slurred his words. York told Beach to get into York's patrol car.  As Beach walked to York's car, he had to use his car for balance, and he swayed, wobbled, and staggered.  York continued asking Beach questions as he sat in York's patrol car.  Beach's speech was so slurred that York had difficulty understanding him and asked him several times to repeat his answers.  While talking to Beach, York noticed a strong odor of intoxicants on Beach's breath, and Beach admitted that he had been drinking beer.

York decided to administer several sobriety tests.  While York administered a horizontal gaze nystagmus sobriety test, Beach swayed, and York had to instruct him several times not to turn his head. York reported that Beach failed the horizontal gaze nystagmus test.  On the one-leg test, Beach stood on his left foot and lifted his foot approximately two inches from the ground.  Told to count, Beach said, "2, 3, 5, 6."  Beach nearly fell over during the test.  When Beach attempted the test a second time, he counted but left his foot on the ground.  York instructed Beach to lift his foot while counting.

---

1. Although the statute does not authorize termination of a driving license and permits only suspension of a license for one year, the General Assembly denominates this action as a revocation and not a suspension.

Beach lifted his foot and immediately put it back down. Beach then again left his foot on the ground and began counting. York reminded him that he was to lift his foot off the ground. Beach lifted his leg and nearly fell over. On the walk-and-turn test, York instructed Beach to stand on a white parking line with his right foot in front of the left. Beach began to sway and nearly fell. Beach then stood with one foot beside the other. York demonstrated the test to Beach and asked Beach to walk on the line. Beach began to walk but was not counting aloud. Beach used his arms for balance, stepped off the line, did not touch heel to toe, and performed an improper turn. While walking back, Beach stepped off the line, took six steps more, and then stopped. York asked Beach whether or not he was finished, and Beach replied, "I can't do it."

York announced to Beach that he was under arrest for driving while intoxicated. When York asked Beach to put his hands behind his back, Beach protested that handcuffing him was not necessary. York insisted on handcuffing Beach, and, according to York's report, Beach became belligerent and refused to cooperate even after York showed him a mace can and threatened to use it. Beach testified at trial, however, that he was not belligerent and did not act aggressively toward York. York sprayed Beach with mace. According to Beach, York sprayed an entire can of mace into his face and eyes. York pulled Beach's hands behind his back and handcuffed him.

York called for Warsaw ambulance personnel to assist Beach in relieving the mace's effects. When ambulance personnel arrived, they irrigated and flushed Beach's eyes for 15 minutes with sterile water. They also advised York to irrigate Beach's eyes again later. York did not follow these instructions.

York took Beach to the Benton County Jail where he advised Beach of the Implied Consent Law and asked him to submit to a breath test. Beach agreed to take the test, but, when York told him to blow into the machine, he refused. Beach told York that he would not take the breath test until York got the mace out of his eyes and until he could see the machine. Beach testified at trial:

Q. So when you got to the jail, did they indicate to you that they were going to ask you to submit to a chemical test?

A. Yeah. They asked me to blow in—blow into the tube and—

Q. Okay. But—[s]o did they ask you—[d]id you indicate whenever they initially asked you, did they—did you indicate that you would take the test; that you were agreeable to take the test?

A. Oh, yeah. I told them, "Yeah," I said, "You just need to get this stuff out of my eyes," because I couldn't see. I was hurting. I didn't want to—I didn't know what I was doing. I mean I didn't want to blow into anything that I couldn't see or anything. I just—

Q. So this mace of—and the stuff that they'd sprayed you with, did any of that get into your mouth.

A. Oh, yeah.

Q. Okay. So when you were there at the jail and they were asking you to take the breathalyzer, what—could you see anything at all?

A. No, I couldn't.

Q. What was happening as far as your eyes and your nose and your mouth?

A. It was burning and hurting real bad. I mean I—my nose was running and I asked them—I just asked them if they could help me out, get it out of my

eyes, and they kept asking—they just wanted me to blow into the machine. And I says, "Well, I just—I hurt. I just—I need you to get this out of my eyes and face and stuff."

Q. Okay. So if they had gotten you flushed out and so that you would be able to see, you were more than willing to take the test; is that right?

A. Yes. I told them right off the bat. I just—I was hurt.

On cross-examination, Beach testified:

Q. . . . . So he asked you to take the breath test, correct?

A. Yes.

Q. Okay. And you didn't do it?

A. I said, "Yes, I will." I said, "You just got to get this stuff out of my eyes." I said—exactly what I told them. I said, "I don't want to blow into anything I can't see." I was hurting. I just—

On the Implied Consent Form, York had checked the box next to "Yes" in answering the form's question: "Having been informed of the reasons for requesting the test(s), will you take the test(s)?" On the same form, York wrote, "Refused," in the box where the test's result was to be recorded. York checked the box in answer to the statement: "Chemical Test Refusal (Officer must mark box if subject refused test)." York notified Beach that his driving license would be revoked for one year pursuant to Section 577.041 because of his refusal to submit to the breath test. Beach concedes that the director made a *prima facie* case that York arrested him and that York had reasonable grounds to believe that he was driving in an intoxicated condition. He contests only the issue of whether or not he refused to submit to the breath test. The circuit court found that

the director did not meet her burden of proving that Beach refused to take the test because of what the circuit court termed a "conflict in evidence." The only conflicts in evidence that we have discovered are the discrepancy in York's report concerning Beach's agreeing to take the test and Beach's contradicting York's contention that Beach was belligerent and uncooperative when York handcuffed him.[2]

■ In Section 577.020.1, RSMo Supp. 2005, the General Assembly has declared that any person who drives on Missouri's public highways shall be deemed to have given implied consent to a chemical test to determine the content of drugs or alcohol in his or her blood. According to the statute, officers may insist on giving the test only if they have arrested the driver on reasonable grounds to believe that he or she was driving in an intoxicated or drugged condition. To revoke a driving license on the ground that a driver has refused to submit to a chemical test, the director must establish that (1) a qualified law enforcement officer arrested or stopped the driver, (2) with reasonable grounds to believe that the driver was driving while in an intoxicated or drugged condition, and (3) the driver refused to submit to a chemical test. Section 577.041.4; *Zimmerman v. Director of Revenue*, 988 S.W.2d 583, 585 (Mo.App.1999). If the director fails to establish one of these requirements, the driver's driving privileges must be reinstated. Section 577.041.5; *Zimmerman*, 988 S.W.2d at 585.

■ A "refusal," for purposes of Section 577.041, occurs when an individual, after being requested to take a breath test, declines to do so of his own volition. *Spra-*

2. Whether or not Beach was belligerent and uncooperative when York handcuffed him is inconsequential to the determination of whether the director could revoke Beach's driving license for refusing to submit to a breath test.

*dling v. Deimeke*, 528 S.W.2d 759, 766 (Mo.1975). A qualified or conditional consent is tantamount to a refusal, except where a driver qualifies a refusal on his having an opportunity to contact an attorney. *Kotar v. Director of Revenue*, 169 S.W.3d 921, 925 (Mo.App.2005); *see also* Section 577.041.1.

Beach acknowledged in his testimony that he never took the breath test and that he qualified his consent to the breath test on the officer's flushing out his eyes and on his being able to see the breath-analyzing machine. That York's report contained "a conflict" was inconsequential. Beach declared under oath that he agreed to take the breath test only on his conditions, which did not include a desire to call a lawyer.

Beach incorrectly argues that a qualified consent is not necessarily a refusal if a reasonable basis exists for the qualification. He asserts that a driver's injuries may be such that he is rendered incapable of refusing a test and that the mace in his eyes and mouth was a physical condition that rendered him incapable of refusing.

■ A qualified consent, however, is refusal for purposes of Section 577.041. The statute provides only one exception to its requirement that a driver must submit to a breath test when an officer, acting on probable cause that the driver was driving while intoxicated, asks him to take the test: when the driver asks to talk to a lawyer, the test may be delayed 20 minutes for him to do so. Section 577.041; *Kotar*, 169 S.W.3d at 925. By attaching conditions to his consent—*i.e.*, that he would take the test only if his eyes were flushed and only if he could see the machine—Beach refused to take the breath test.

■ To the extent that Beach asserts that he rebutted the director's case because his physical condition rendered him incapable of refusing the test, he is asserting an exception not recognized by the General Assembly. This court has stated, "[W]hen a person is able to provide additional evidence showing that [he] was injured to the point that [he] was not capable of refusing to submit to the test, then [the circuit] court may reasonably conclude the person did not withdraw [his] consent to submit to a test[.]" *Nace v. Director of Revenue*, 123 S.W.3d 252, 259 (Mo.App. 2003). A driver, however, cannot "avoid the effect of Section 577.041 when they are intoxicated or suffering from minimal injuries and refuse to provide a blood sample." *Id.* In *Nace*, the driver was incoherent, semi-unconscious, and unresponsive to questions; hence, this court concluded that "a reasonable person would not have perceived ... Nace's actions as a refusal." *Id.*

Beach was not injured to the point that he was not capable of refusing to submit to the test.[3] He merely was "hurting" and did not want to blow into something he could not see. He was not incapable of submitting to the test. Beach was, in fact, very coherent and responsive to York's request to take a breath test. He testified that he said, "Yes, I will [take the test, but you] just got to get this stuff out of my eyes." Beach applied a condition to his consent, and such constitutes a refusal for purposes of Section 577.041.

---

**3.** Indeed, had Beach been injured to the point that he was not capable of refusing to submit to the test, York could have administered the test pursuant to Section 577.033, RSMo 2000, which says, "Any person who is dead, unconscious or who is otherwise in a condition rendering him incapable of refusing to take a test as provided in sections 577.020 to 577.041 shall be deemed not to have withdrawn the consent provided by section 577.020 and the test or tests may be administered."

The director made a *prima facie* case establishing that Beach refused to submit to a breath test, and Beach did not rebut it. We, therefore, reverse the circuit court's judgment and remand with directions that the circuit court reinstate the one-year revocation of Beach's driving privileges.

JOSEPH M. ELLIS, Presiding Judge, and THOMAS H. NEWTON, Judge, concur.